## DUDLEY PAGE COTTON *v.* SUPERVISORS OF ELECTIONS OF BALTIMORE CITY.

### [No. 117, October Term, 1932.]

*Decided November 2nd, 1932.  Opinion delivered March 20th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*George Cochran Doub* and *John W. Avirett, 2nd,* for the appellant.

*Willis R. Jones, Deputy Attorney General,* with whom was *William Preston Lane, Jr., Attorney General,* on the brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

The appellant, Dudley Page Cotton, a resident and taxpayer of Baltimore City, filed his petition in the Superior Court of Baltimore City, alleging therein in substance that the mayor and city council of that city purchased in 1928 fifty voting machines for use in primary and general elections in the city. Their purchase followed the passage of the Act of 1914, ch. 513, now codified in the Code of 1924 as sections 222, 223 and 224 of article 33, title "Elections." These sections are as follows:

"222. The Election Supervisors of Baltimore City and the Election Supervisors of the respective counties are hereby authorized and empowered to use voting machines in primary and general elections under such rules and regulations as said Election Supervisors may deem advisable or necessary. Any improper, illegal or fraudulent act on the part of election officials or voters, to be subject to the same fines and penalties as are now provided in the general elections laws of this State so far as the same may be made to apply to elections when Voting Machines are used.

"223. All elections held through the medium of Voting Machines shall have the same validity in law as elections held by means of paper ballots.

"224. The Election Supervisors of Baltimore City and the Election Supervisors of the respective counties are hereby given the power and authority to determine what precincts in said city and what precincts in the respective counties shall be first equipped with Voting Machines, and said Election Supervisors are hereby authorized to purchase from time to time such machines as meet their approval and in such number as they deem advisable, payment for said machines to be made out of money appropriated for that purpose."

The petition alleges that, after the purchase of the voting machines, the late Thomas H. Robinson, then Attorney General of Maryland, rendered an opinion to the board of supervisors of elections of Baltimore City, construing the provisions of chapter 202, section 59, of the Acts of 1896, now section 73 of article 33 of the Code of 1924, providing that

the number of voting booths "shall not be less than one for every one hundred voters qualified to vote at such polling place, and not less than five in any city" precinct, in which he held that at least five voting machines are required in each polling place where the machines are used, and that "there must be a machine for at least one hundred voters, or fractional part thereof"; that in accordance with the advice of the Attorney General five machines were used in each of ten precincts of the city in the general elections of 1928 and 1930 and the primary election of 1931, when in many of the polling places at least three and possibly four of the machines were not used but remained idle during the election; that, notwithstanding the protest of the mayor of Baltimore City against the use of so many as five machines in each of said voting places at the approaching election of 1932, the supervisors of elections have indicated their intention of using at such election five machines in each of the polling places where machines are used.

The petition then alleges that there is no statutory obligation upon the supervisors of elections to install not less than five voting machines in each polling place, and not less than one voting machine for every one hundred qualified voters, and further alleges that the opinion of Attorney General Robinson, as well as that subsequently obtained from William P. Lane, the present Attorney General, is unsound and fails to express accurately the proper interpretation of those statutes.

It is then alleged in the petition that, unless the writ of mandamus is granted as prayed, the supervisors of elections will mistakenly apply the provisions of chapter 202, section 59, of the Acts of 1896, placing not less than five machines in each polling place, "regardless of the fact that fewer machines would adequately and expeditiously handle the vote."

The petition then prays that a writ of mandamus be directed to the supervisors of elections, (1) commanding and requiring them to exercise the discretion and responsibility conferred upon them by chapter 513 of the Act of 1914 to determine the rules and regulations which they deem advisable or necessary for the use of the machines at the approach-

ing election of November 8th, 1932, and to prevent and restrain them, in the use and operation of the machines, from giving effect to the provisions of chapter 202, section 59, of the Acts of 1896, as construed by the Attorney Generals of this state; or (2) commanding and requiring them, in the use of the machines, to install in each polling place only so many as may be necessary to enable the voters to cast their votes conveniently without regard to the provisions of chapter 202, section 59, of the Acts of 1896; and (3) it asks for further relief as the court may deem just and proper.

The supervisors of elections answered the petition, admitting that "in the use of the machines they felt obliged to install not less than five machines in each precinct, which action was in accordance with the opinion" they had received from the Attorney Generals, who by law are their legal advisors. But they denied that "in the use of said machines it was found that one machine or two machines would be adequate in any precinct in which they were used, and show that at the general election of 1930, in which said machines were used, it was found necessary to use from three to five machines, and in one precinct where five machines were in use it was found at one time that as many as twenty-one voters were waiting to cast their ballots."

They also denied the conclusions of law contained in the petition, and admitted that, unless restrained by the court, they would at the approaching election of 1932 "install not less than one machine for each one hundred voters and not less than five machines in each polling place," where the said machines were to be used. They alleged in their answer that "in the conduct of elections in Baltimore City it has been found that a very large percentage of the voters called at the polling places during the early hours of the day, and it is the belief of your respondents that the object of the law in requiring not less than one voting compartment for every one hundred voters and not less than five at any polling place in the city, is to enable the voters to cast their ballots promptly after arriving at the polling places." And, if they were

to "fail to provide the minimum equipment required by law, and if any substantial number of voters should consume the maximum amount of time allowed by law for casting their ballots, it will necessarily follow that other voters will be required to wait long periods of time in order to cast their ballots and certain persons by reason of the limited time in which they have to vote may be disfranchised altogether."

A jury trial was waived, and the case was heard by the court. At the trial evidence was taken in support of the petition and answer, and at its conclusion a verdict was rendered in favor of the respondents and the writ of mandamus refused. It is from the order of the court refusing to issue the writ that the appeal in this case was taken.

The contention of the appellant is that the appellees have never exercised the discretion vested in them, but have relied solely upon the correctness of the construction by the Attorney Generals of the law, under which the supervisors were to act. This construction being wrong, as they contend, the supervisors should proceed to exercise the discretion lodged in them.

The law in this state contemplates secret voting in all elections therein, and, to aid in accomplishing this end, the Legislature, by chapter 202, section 59, of the Acts of 1896, provided for compartments or voting booths to be erected in each of the voting places into which the voter could retire and cast his or her ballot in secrecy. The statute specifically provided that the number of compartments should not be less than one for every hundred voters qualified to vote at such polling places, and not less than five voting machines in each place.

At the time of the passage of this law, voting machines were not in use in this state. The voters at that time, and for many years thereafter, retired to the booths provided for them, and voted by marking their ballots with a pencil found therein especially provided by the act.

The Legislature fully recognized the importance of providing a sufficient number of compartments or booths in

6

which the voters were to cast their ballots, knowing full well that, if adequate provisions were not made therefor, all voters would not be able to vote. And, in passing this act, they evidently did not deem it wise and proper to leave the question as to how many of these compartments should be erected in each polling place to the election officials to determine, but stated specifically the number of booths to be placed therein, as above set forth.

As we have said, the use of voting machines in this state was the result of the passage of the Act of 1914, chapter 513. By this act power and authority was given to election supervisors to use voting machines "in primary and general elections under such rules and regulations as said Election Supervisors may deem advisable or necessary." And by it the supervisors were also "given the power and authority to determine what precincts in said city * * * shall be first equipped with voting machines." These were the only provisions of the act having any relation to the use and regulations of voting machines. The question therefore is: What effect, if any, have these provisions of this later act on the provision of the earlier act that at least five compartments or booths shall be placed in each polling place in the city?

Frank A. Stone, a sales representative of the company from which the machines were bought, placed upon the stand by the plaintiff, in describing the operation of the machines, stated: "When a voter goes into the machine to vote, the election official pulls the cord which releases a lever from the left-hand side to allow the voter to vote. The voter then goes in the booth and moves the lever from the left-hand side to the right closing the curtain. When he has voted, he moves the lever from the right-hand side to the left, opening the curtain."

It will thus be seen that a booth is no less needed or required in the use of the machine than it is where a machine is not used. It is an essential part of the equipment in the use of a voting machine. It may also be said that a voter using a machine, like one who is voting without it, is, while

voting, excluded from the view of everyone, including the officials; and, while so engaged in voting, his movements are not subject to the observation of the officials.

The evidence offered by the plaintiff is to the effect that in a number of polling places in which five machines were placed no more than two or three of these were used, but in considering this fact we must bear in mind that, in determining the number of machines to be placed in any one polling place, the number so determined upon must be sufficient to serve the voters at rush times, or at the time when the greatest number are at the polls to vote, and it is not to be determined at any other time.

It is just as essential to limit the time of the voter using the machine as it is to limit the time of those voting without it. It may be assumed, we think, that, as the later statute fixed no limit, it was the intention of the Legislature that the limit fixed by the earlier statute should apply. If, as a matter of fact, a less time and fewer booths are required in voting by the use of machines, some provision should have been made in the later statute, if it was thought advisable, for the reduction of the number of booths in which machines were to be used. But the later statute did not so provide, and we discover no reason why the number of booths limited by the earlier statute should not apply where machines are used. As voting by machines was to be substituted for the system of voting by marking the ballot with pencil, and as it was shown to be impracticable to use the two methods of voting in the same precinct, the number of machines should equal the number of booths required.

The language used in the later statute—that the machines were to be used "under such rules and regulations as said Election Supervisors may deem advisable or necessary," is not, in our opinion, sufficiently broad to repeal by implication the positive requirement that not less than five machines should be used in any one polling place. The use of the machine was subject to certain minor rules and regulations of the supervisors, but such power of regulation did not go so far as to repeal the provisions referred to in the earlier act

8

in relation to the number of voting booths required in each polling place.

The order refusing the mandamus was properly passed, and it was for the reasons stated that the order appealed from was affirmed by the *per curiam* heretofore filed.

*Affirmed.*

BOND, C. J., dissents.